UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FERNANDO VILLANUEVA-GALVEZ,

Plaintiff,

v.

CITY OF SAN JOSE, et al.,

Defendants.

Case No.  24-cv-09055-VKD

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 51

Plaintiff Fernando Villanueva-Galvez brings this civil rights action against defendants City of San Jose ("City") and Officer Eliseo Anaya, along with 50 Doe defendants.  Dkt. No. 14.  This action arises from defendants' deployment of a police canine to arrest Mr. Villanueva-Galvez. The complaint asserts five claims: (1) excessive force in violation of the Fourth Amendment, 42 U.S.C. § 1983, against Officer Anaya and Doe defendants; (2) a *Monell*[1] claim for maintaining an unconstitutional custom or policy of using excessive force through the use of police canines, against the City and Doe defendants; (3) violation of the Bane Act, Cal. Civ. Code § 52.1, against all defendants; (4) battery, against all defendants; (5) and negligence, against all defendants.  *Id.* ¶¶ 27-57.

Defendants move for summary judgment on all claims.  Dkt. No. 51.  Mr. Villaneuva-Galvez opposes the motion as to all claims except for the *Monell* claim.  Dkt. No. 55.  The Court heard oral argument on the motion on May 5, 2026.[2]  Dkt. No. 62.  Upon consideration of the

---

[1] *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

[2] All parties have consented to magistrate judge jurisdiction.  Dkt. Nos. 4, 16.  Placeholder Doe defendants are not "parties" for purposes of assessing whether there is complete consent of all

moving and responding papers, as well as the oral arguments presented, the Court grants the motion as to claim 2 and denies the motion as to the remainder of the claims.

## I.    BACKGROUND

The following material facts are undisputed unless otherwise noted.

At approximately 11:00 p.m. on October 1, 2023, the San Jose Police Department ("SJPD") responded to a call at Mr. Villanueva-Galvez's apartment complex, reporting that Mr. Villanueva-Galvez had stabbed a woman after a dispute in the laundry room and then hid in his apartment.  Dkt. No. 14 ¶¶ 2, 16-19; Dkt. No. 51-2 ¶¶ 10-11.

An arrest team arrived at the scene, including Officer Anaya and his police canine, Ronin. Dkt. No. 51-2 ¶¶ 2, 10-11; Dkt. No. 14 ¶ 4.  The arrest team was informed that Mr. Villanueva-Galvez stabbed a woman in the abdomen and finger following an argument over laundry, attempted to stab another person, and then fled to his apartment, barricading himself inside and refusing to surrender.  Dkt. No. 51-2 ¶ 11.

The arrest team surrounded Mr. Villanueva-Galvez's apartment building and made announcements in English and Spanish over loudspeakers, calling for Mr. Villanueva-Galvez to surrender.  Dkt. No. 14 ¶ 4; Dkt. No. 51-2 ¶ 12; Dkt. No. 55 at 1.  The announcements included warnings that if Mr. Villanueva-Galvez did not surrender, a police dog would be used to locate him and that he could be bitten.  Dkt. No. 51-2 ¶ 12.  Mr. Villanueva-Galvez did not respond to any of those announcements or give any indication of surrender.  *Id.*

At approximately 2:15 a.m. on October 2, 2023, Officer Cesar Octavio Fernandez placed a pole camera through a bedroom window to observe Mr. Villanueva-Galvez inside his apartment. Dkt. No. 51-3 ¶ 3.  Using the pole camera, Officer Fernandez saw Mr. Villanueva-Galvez lying down on a bed with his back facing the window.  *Id.*  He was completely covered by a blanket except for his face.  *Id.*  Officer Fernandez also saw that a sofa had been placed directly in front of the bedroom door.  *Id.*  The arrest team deployed a noise flash device and issued several more

parties to magistrate judge jurisdiction.  *Geppert v. Doe 1*, No. 23-cv-03257-SVK, 2023 WL 5804156, at *1 n.2 (N.D. Cal. Sept. 7, 2023); *RingCentral, Inc. v. Nextiva, Inc.*, No. 19-cv-02626-NC, 2020 WL 978667, at *1 n.1 (N.D. Cal. Feb. 28, 2020); *see also Williams v. King*, 875 F.3d 500, 502-05 (9th Cir. 2017).

announcements in English and Spanish to persuade Mr. Villanueva-Galvez to surrender, but he did not respond to these announcements or otherwise communicate any intent to surrender.  Dkt. No. 51-2 ¶ 14.  At approximately 4:00 a.m., Officer Fernandez again used the pole camera to view the inside of Mr. Villanueva-Galvez's bedroom.  Dkt. No. 51-3 ¶ 4.  Officer Fernandez saw that Mr. Villanueva-Galvez was still lying on his bed and that he was holding an object approximately six inches long that Officer Fernandez could not identify.  *Id.*  Officer Fernandez observed that the bedroom door was now open.  *Id.*

At approximately 4:13 a.m., the arrest team decided to enter the apartment and to use Ronin to search for Mr. Villanueva-Galvez.  Dkt. No. 51-2 ¶ 17; Dkt. No. 51-3 ¶ 5; Dkt. No. 55-1 ¶ 3, Ex. 2 (Anaya Dep. at 62:17-24).  No additional warnings about the possible use of a police canine were given to Mr. Villanueva-Galvez at this time.[3]  Dkt. No. 62.  After officers used a ram to open the front door of the apartment, Officer Anaya deployed Ronin to search for Mr. Villanueva-Galvez while Officer Anaya and the rest of the arrest team waited at the front door.  Dkt. No. 51-2 ¶ 19; *id.* ¶ 19, Ex. C (Anaya BWC at 4:14:23)[4]; Dkt. No. 51-3 ¶ 5.  Nearly simultaneously, officers outside the apartment building sent canisters of a chemical agent into the apartment through the windows.  Dkt. No. 51-2 ¶ 19; Dkt. No. 55-1 ¶ 3, Ex. 2 (Anaya Dep. at 64:20-65:24).

Officer Anaya lost sight of Ronin as the police dog searched the inside of the apartment.  Dkt. No. 51-2 ¶¶ 19-20; *id.* ¶ 19, Ex. C (Anaya BWC at 4:14:27).  Officer Anaya gave three commands to recall Ronin in order to redirect his search, but Ronin did not return when called.  Dkt. No. 51 at 4; Dkt. No. 51-2 ¶ 19, Ex. C (Anaya BWC at 4:15:31-38).  Approximately one minute and thirty seconds after Ronin moved out of Officer Anaya's view, Mr. Villanueva-Galvez began shouting.  Dkt. No. 51-2 ¶ 19, Ex. C (Anaya BWC at 4:15:57-4:16:05).  Officer Anaya again commanded Ronin to return, but Ronin did not return when called.  *Id.* (Anaya BWC at

---

[3] The parties agree that the last warning about SJPD's intended use of a police dog was provided approximately two hours before SJPD officers entered Mr. Villanueva-Galvez's apartment.  Dkt. No. 62.

[4] Citations to body-worn camera footage cite to the timestamp in the top right corner of the video.

4:16:08). Officer Anaya and the other officers entered the apartment and found Mr. Villanueva-Galvez and Ronin in a hallway towards the back of the apartment. Dkt. No. 51-2 ¶ 21; Dkt. No. 51-3 ¶ 7, Ex. A (Fernandez BWC at 4:16:14). Mr. Villanueva-Galvez stood with his back to the officers, and Ronin was next to Mr. Villanueva-Galvez. Dkt. No. 51-3 ¶ 7, Ex. A (Fernandez BWC at 4:16:14). At this point, Ronin was not biting Mr. Villanueva-Galvez. *Id.* However, after about two seconds, Ronin began biting Mr. Villanueva-Galvez on the left arm. *Id.* (Anaya BWC at 4:16:16). The officers brought Mr. Villanueva-Galvez to the ground with Ronin still biting his arm. *Id.* (Anaya BWC at 4:16:21). No body-worn camera footage captures the entirety of Ronin's contact with Mr. Villanueva-Galvez due to obstructions from the officers' clothing, their positioning, and the lack of light. While the total duration of Ronin's bite to Mr. Villanueva-Galvez's left arm is not clear from the body-worn camera footage, the parties agree that 14 seconds elapsed from the time that the officers secured Mr. Villanueva-Galvez's arms to the time that Officer Anaya removed Ronin from the bite. Dkt. No. 51 at 5; Dkt. No. 51-1 ¶ 3, Ex. B (Burwell Dep. at 64:21-65:3); Dkt. No. 55 at 17, 19, 20, 21.

After Officer Anaya removed Ronin from Mr. Villanueva-Galvez's arm, he observed that Mr. Villanueva-Galvez had bite injuries on his face, head, and neck. Dkt. No. 51-2 ¶ 23. The parties dispute how Ronin came to bite Mr. Villanueva-Galvez on his face, head, and neck, as Ronin was out of the officers' sight when he bit Mr. Villanueva-Galvez in these areas. *Id.* Mr. Villanueva-Galvez claims that when he opened his bedroom door, Ronin was outside. Dkt. No. 55-1 ¶ 9, Ex. 8 (Villanueva-Galvez Dep. at 65:11-66:10). He says that Ronin jumped and attacked him by biting his neck. *Id.* Officer Anaya claims that while Ronin is trained to generally bite the arm, he may bite whatever body part is accessible to him. Dkt. No. 55-1 ¶ 3, Ex. 2 (Anaya Dep. at 35:4-36:24). Defendants suggest that Mr. Villanueva-Galvez's face, head, and neck were the only body parts accessible to Ronin. *See* Dkt. No. 51 at 5.

In total, Officer Anaya recorded that Mr. Villanueva-Galvez suffered 19 bite injuries, 11 of which were to his face, head, and neck areas. Dkt. No. 55-1 ¶ 2, Ex. 1 at 6-7. As of December 2025, Mr. Villanueva-Galvez complained of scarring and pain in his neck, hand, arm, and knee as a result of bites from the police dog. Dkt. No. 55-1 ¶ 9, Ex. 8 (Villanueva-Galvez Dep. at 28:16-

United States District Court
Northern District of California

36:8, 38:25-39:7). He also says that he suffers from vision problems in his left eye and numbness in his mouth. *Id.* (Villanueva-Galvez Dep. at 35:9-37:4).

## II.    LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *See id.* at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial.[5] *See id.* A genuine dispute of fact is one that could reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Id.* at 248-49.

If the non-moving party fails to oppose the motion, the court must still consider whether the grant of summary judgment is appropriate based on the record. A motion for summary judgment may not be granted solely on the basis that the opponent did not contest the motion. *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013). However, the court may take any

---

[5] "Evidence may be offered to support or dispute a fact on summary judgment . . . if it *could be presented in an admissible form* at trial." *Iglesia Ni Cristo v. Cayabyab*, No. 18-cv-00561-BLF, 2020 WL 1531349, at *5 (N.D. Cal. Mar. 31, 2020) ((quoting *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925-26 (9th Cir. 2014)). A party need not present evidence in admissible form as part of its summary judgment submission, so long as the party demonstrates that the evidence could be presented in admissible form at trial. *See id.*

United States District Court
Northern District of California

unchallenged facts as "undisputed for purposes of the motion." Fed R. Civ. P. 56(e)(2).

## III. DISCUSSION

Defendants move for summary judgment on all claims. Dkt. No. 51 at 2. Mr. Villanueva-Galvez concedes the motion for summary judgment on his *Monell* claim (claim 2). Dkt. No. 55 at 25. Having considered the basis for defendants' motion as to claim 2, the Court finds that it should be granted. The Court also dismisses all Doe defendants, as Mr. Villanueva-Galvez concedes that he has no claims against any unidentified defendants. Dkt. No. 62.

The Court addresses defendants' remaining arguments regarding the section 1983 excessive force claim, qualified immunity, and the state law claims.

### A. Excessive Force, 42 U.S.C. § 1983 (Officer Anaya)

In claim 1, Mr. Villanueva-Galvez asserts a claim under 42 U.S.C. § 1983, alleging that Officer Anaya used excessive force, in violation of his Fourth Amendment rights.

Section 1983 "imposes liability upon any person who, acting under color of state law, deprives another of a federally protected right." *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 624 (9th Cir. 1988). Although the statute "is not itself a source of substantive rights, [it] provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal citation omitted). To prevail on a section 1983 claim, a plaintiff must therefore prove two elements: "(1) the defendants acting under color of state law, (2) deprived plaintiff[] of rights secured by the Constitution or federal statutes." *Karim-Panahi*, 839 F.2d at 624. Claims of deadly and excessive force that "arise[] in the context of an arrest . . . [are] most properly characterized as . . . invoking the protections of the Fourth Amendment" against unreasonable seizures. *Graham*, 490 U.S. at 394 (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). All excessive force claims arising before or during arrest are analyzed under *Graham*'s "reasonableness" standard, which requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake." *Id.* at 396.

The parties agree that Officer Anaya acted under color of state law. Mr. Villanueva-Galvez claims that Officer Anaya's deployment of Ronin and the duration of Ronin's bite constitute the use of excessive force, including deadly force, in violation of Mr. Villanueva-

United States District Court
Northern District of California

6

Galvez's Fourth Amendment rights. Dkt. No. 14 ¶¶ 27-29. Defendants argue that Mr. Villanueva-Galvez has not produced evidence sufficient to establish a violation of his constitutional rights with respect to the deployment of the police canine or the duration of the bite.

### 1.    Use of excessive force

Mr. Villanueva-Galvez contends that Officer Anaya's use of force constituted excessive force sufficient to establish a violation of his Fourth Amendment rights. *See* Dkt. No. 55 at 10, 16.

The Fourth Amendment's reasonableness inquiry "in an excessive force case is an objective one." *Graham*, 490 U.S. at 397. The question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* A court should not view the officers' actions "with the 20/20 vision of hindsight" but must instead consider "the fact that police officers are often forced to make split-second judgments." *Williams v. City of Sparks*, 112 F.4th 635, 643 (9th Cir. 2024).

The Court's analysis is guided by the *Graham* factors: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (internal citations omitted). Given these factors, reasonableness is "ordinarily a question of fact for the jury," and thus "summary judgment should be granted sparingly." *Fink-Carver v. Kuhn*, No. 21-cv-00664-JSW, 2024 WL 734496, at *6 (N.D. Cal. Feb. 22, 2024) (citation omitted), *appeal dismissed*, No. 24-1718, 2024 WL 4253183 (9th Cir. Aug. 12, 2024).

### a.    Severity of intrusion

In assessing the level of force used, courts "assess both 'the risk of harm and the actual harm experienced.'" *Sabbe v. Washington Cnty. Board of Comm'rs*, 84 F.4th 807, 821 (9th Cir. 2023) (quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)). Defendants do not meaningfully dispute that this factor favors Mr. Villanueva-Galvez.[6] A reasonable jury could find

---

[6] Defendants primarily argue that the use of force did not amount to deadly force. *See* Dkt. No. 51 at 9.

that the use of a police canine here involved substantial force resulting in a severe intrusion. *See Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (holding force used to arrest plaintiff was severe where police canine bit plaintiff's left side and left arm).

### b.    Governmental interest

"The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force." *Sabbe*, 84 F.4th at 821.  Courts in the Ninth Circuit use a three-step approach to evaluate the strength of the government's interest in using force: "(1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396).

### i.    Severity of crime

Here, Mr. Villanueva-Galvez concedes that he "was suspected of assault with a deadly weapon for stabbing his neighbor in the laundry room area of his apartment complex." Dkt. No. 55 at 14.  However, he contends the officers "knew from witnesses . . . that [p]laintiff potentially acted out of self-defense." *Id.*  Mr. Villanueva-Galvez offers no factual support for that statement and does not explain how this consideration impacts analysis of this factor.

"The government has an undeniable legitimate interest in apprehending criminal suspects, and that interest is even stronger when the criminal is . . . suspected of a felony, which is by definition a crime deemed serious by the state." *Miller v. Clark*, 340 F.3d 959, 964 (9th Cir. 2003) (internal citation omitted).  This factor weighs in favor of Officer Anaya's position.

### ii.    Threat to officer safety

Whether a suspect poses an immediate threat to officer safety is "the most important" factor in evaluating the government's interest. *Miller*, 340 F.3d at 964.  The Court addresses separately the threat to officer safety at the time Officer Anaya initially deployed Ronin and at the time the officers apprehended Mr. Villanueva-Galvez.

*Deployment of police dog*

Defendants argue that Mr. Villanueva-Galvez posed an immediate threat to officer safety

United States District Court
Northern District of California

because the "unsearched apartment presented a significant and unknown risk," and the officers did not know whether he was armed and "lying in wait to attack." Dkt. No. 51 at 11. Mr. Villanueva-Galvez argues that he could not have posed an immediate threat because the officers used a pole camera and saw him lying on his bed with his bedroom door open shortly before they entered the apartment; the officers should have known that he was not holding a knife when he was lying down; the officers had deployed chemical gas canisters into the apartment in order to disable him; and the officers should have known that he "may have stabbed his neighbor out of self-defense." Dkt. No. 55 at 13-14.

The Ninth Circuit's decisions in *Miller v. Clark*, 340 F.3d 959 (9th Cir. 2003) and *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017) provide guidance regarding the circumstances in which a suspect poses a threat to officers sufficient to justify the deployment of a police dog. In *Miller*, an officer pulled over driver James Miller on suspicion of a traffic violation. *Miller*, 340 F.3d at 960. Miller fled from police onto his "parents' large rural property," which was covered in "dark, wooded terrain." *Id.* at 960-61. Unable to find Miller, the officers released a canine to apprehend him. *Id.* at 961. Upon finding Miller, the dog bit his upper arm for a full minute causing "severe injury" and shredding his skin and muscles "as deep as the bone." *Id.* The Ninth Circuit concluded that the threat to officer safety was "immediate" for several reasons. *Id.* at 965. First, the officer "did not know where within those woods Miller was hiding." *Id.* The woods were dark and "strewn with . . . unseen obstacles obscured by darkness." *Id.* (citation modified). Second, unlike the officers, the plaintiff "was familiar with the terrain." *Id.* Third, the officer did not know if Miller was armed but had previously seen a "seven or eight-inch knife on the [car's] seat." *Id.* at 960. Fourth, Miller had "ignored [the officer's] warning that he was about to release a police dog." *Id.* at 965. Under these circumstances, the Ninth Circuit concluded that Miller "possess[ed] a strategic advantage over the deputies, . . . [which] entitled [the officer] to assume that Miller posed an immediate threat." *Id.*

In *Lowry*, the plaintiff had returned to her office after a night out drinking with her friends and "accidentally triggered the alarm before falling asleep on the couch." *Lowry*, 858 F.3d at 1253. Police entered the building, suspecting "that a burglary might be in progress and that the

9

intruder could be lying in wait." *Id.* After calling for surrender and hearing no response, the police warned that they had a police dog. *Id.* They released the dog, which found Lowry asleep on the couch and bit her lip. *Id.* at 1254. The Ninth Circuit held that the officers reasonably believed the threat to their safety was immediate. *Id.* at 1258. The officers believed they were responding to a burglary in progress and that they might encounter an armed suspect. *Id.* They entered a "dark commercial building [with] an open door." *Id.* Nobody responded to their warnings. *Id.* Citing *Miller*, the court stated that because the officers believed the suspect "was hiding," may have been "armed," and did not respond to "the officer's warning," "similarly 'objectively menacing circumstances' existed [in *Lowry*]." *Id.*

Defendants contend the circumstances here are indistinguishable from the "objectively menacing circumstances" presented in *Miller* and *Lowry*. Dkt. No. 51 at 10-12. The Court disagrees. First, a jury could find that it was unreasonable for the officers to believe that Mr. Villanueva-Galvez posed an immediate threat to the officers. Unlike the officers who faced a "dark, wooded terrain" in *Miller* and a "dark commercial building" in *Lowry* without knowing the location of the suspect, the officers here knew Mr. Villanueva-Galvez was in the bedroom of his apartment, which they could observe using a pole camera. *See* Dkt. No. 51-3 ¶¶ 3-4. Indeed, Officer Fernandez saw Mr. Villanueva-Galvez lying on his bed in his bedroom approximately 13 minutes before the officers breached the apartment's front door. *See id.* ¶¶ 4-5. Although the arresting officers had reason to believe Mr. Villanueva-Galvez had a knife, a jury could also conclude officers already knew, or had the means to observe, exactly where Mr. Villanueva-Galvez was, thus, limiting the risk to officers' safety. *See Paredes v. City of San Jose*, 760 F. Supp. 3d 902, 915-16 (N.D. Cal. 2024) (finding a reasonable jury could find that suspect did not pose an immediate threat to officer safety because unlike *Miller* and *Lowry*, "the officers knew exactly where [the suspect] was hiding" and a "helicopter confirmed his location").

Second, it is undisputed that Officer Anaya deployed Ronin as other officers simultaneously deployed canisters of a chemical agent into the apartment. Mr. Villanueva-Galvez argues that a reasonable officer would have expected Mr. Villanueva-Galvez to struggle with the effects of the chemical agent, diminishing any threat to the officers. Dkt. No. 55 at 14. The SJPD

United States District Court
Northern District of California

Manual lists chemical agents as a "Category II" use of force and police service dogs as a "Category III" use of force. Dkt. No. 51-2 ¶ 3, Ex. A at 281, 286. The manual indicates that chemical agents may be used on "suspects resisting a lawful detention or arrest, or to encourage a suspect to exit an enclosed structure, vehicle, or open space," whereas police dogs may be used for "searches, tracking, apprehension of suspects, and protection of officers and members of the public from serious physical injury." *Id.* at 287, 293. A jury could reasonably conclude that a police dog would not be needed to overcome any active resistance by Mr. Villanueva-Galvez in these circumstances. While Officer Anaya testified in his deposition that the chemical agent "[s]ometimes . . . has an effect, sometimes it doesn't," Officer Anaya also stated in the police report that "[t]he purpose of the chemical agent deployment was to attempt to incapacitate [plaintiff] as a search was conducted of the apartment" and that he "believed the chemical agent was having an affect on [plaintiff]." Dkt. No. 55-1 ¶ 3, Ex. 2 (Anaya Dep. at 63:19-25); *id.* ¶ 2, Ex. 1 at 5.

Construing the evidence in the light most favorable to Mr. Villanueva-Galvez, a reasonable jury could conclude that he did not pose an immediate threat to officer safety.

*Duration of the dog bite*

Defendants argue that once officers entered the apartment and located Mr. Villanueva-Galvez, it was reasonable for Officer Anaya to not call Ronin off from biting Mr. Villanueva-Galvez a second time on his left arm for 14 seconds. Dkt. No. 51 at 13-14. Specifically, defendants argue Officer Anaya needed to "locate his dog, analyz[e] [p]laintiff's and other officers' locations, and ensur[e] that [p]laintiff was sufficiently under control and could not access a weapon" before he could call off Ronin. *Id.* at 13. Mr. Villanueva-Galvez argues that Officer Anaya's conduct was unreasonable because "it was clear that [p]laintiff was severely injured, immobilized, and not resisting officers at all" and he "posed no threat." Dkt. No. 55 at 17, 19.

The body-worn camera footage shows that when SJPD officers first encountered Mr. Villanueva-Galvez in his apartment hallway, he was standing with his back to the officers and Ronin was next to him, not engaged in a bite. Dkt. No. 51-3 ¶ 7, Ex. A (Fernandez BWC at 4:16:14). Then, Ronin jumped and bit Mr. Villanueva-Galvez's left arm, without any command

from Officer Anaya to do so. *Id.* (Fernandez BWC at 4:16:16). There is a dispute of fact about whether Mr. Villanueva-Galvez posed any danger, let alone an immediate threat, to the officers when they discovered him in the hallway immediately before Ronin bit his left arm. In addition, there is a dispute of fact about whether Mr. Villanueva-Galvez posed an immediate threat to the officers for the entire duration of the bite. Defendants do not contend that Mr. Villanueva-Galvez issued any threats to the officers or made any menacing movements towards the officers. Rather, the body-worn camera footage shows that Mr. Villanueva-Galvez was already injured when the officers found him in the hallway and that the officers were able to quickly secure him. Dkt. No. 51-3 ¶ 7, Ex. A (Fernandez BWC at 4:16:14-23).

Construing the evidence in the light most favorable to Mr. Villanueva-Galvez, a reasonable jury could conclude that he had been significantly incapacitated by Ronin's prior bites to his face, head, and neck, by the chemical agent, and/or by Ronin's further bite to his arm, and that he did not pose a threat to officer safety for the duration of the bite. *See Rosenbaum v. Dunn*, No. 20-cv-04777-NC, 2022 WL 17491969, at *6 (N.D. Cal. Nov. 28, 2022) (holding that a jury could find that plaintiff did not pose a danger during the duration of the dog bite where "none of the [d]efendants allege[d] that [plaintiff] issued any specific threats to the officers or actively resisted the officers once [the dog] was engaged"), *aff'd sub nom. Rosenbaum v. City of San Jose*, 107 F.4th 919 (9th Cir. 2024); *Bates v. Rezentes*, 731 F. Supp. 3d 1119, 1134 (N.D. Cal. 2024) (finding that a reasonable jury could conclude that plaintiff "posed no immediate threat because she was surrendered, unarmed, surrounded by officers, and physically incapacitated by the dog's continued hold on her head"), *appeal dismissed*, No. 24-3282, 2024 WL 4866467 (9th Cir. Oct. 24, 2024).

### iii. Active resistance

The final factor is whether Mr. Villanueva-Galvez was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Resistance "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). "[W]here a suspect only passively resists arrest, this factor will only slightly favor the defense." *Paredes*, 760 F. Supp. 3d at 916. There is no serious dispute that Mr. Villanueva-Galvez resisted arrest by

12

United States District Court
Northern District of California

hiding in his apartment for four hours. The question is whether his means and level of resistance supports Officer Anaya's use of a police dog against him.

Mr. Villanueva-Galvez's conduct prior to Ronin's deployment falls on the passive end of the resistance spectrum. Mr. Villanueva-Galvez says he stayed in his apartment out of fear of arrest. *See* Dkt. No. 55-1 ¶ 9, Ex. 8 (Villanueva-Galvez Dep. at 56:22-23, 61:21-62:19). While it appears to be undisputed that Mr. Villanueva-Galvez ignored officers' commands to exit his apartment, Dkt. No. 51-2 ¶¶ 12, 14, it is likewise undisputed that when the officers discovered Mr. Villanueva-Galvez inside his apartment, he was bloodied and standing with his back to the officers and made no movement to avoid apprehension or fight the officers, Dkt. No. 51-3 ¶ 7, Ex. A (Fernandez BWC at 4:16:14). To the extent defendants argue that, at this point, Mr. Villanueva-Galvez "was still trying to get away," such argument is not particularly persuasive. *See* Dkt. No. 60 at 3. Nevertheless, there is a material dispute of fact of whether Mr. Villanueva-Galvez was attempting to evade arrest or attempting to avoid further bites by Ronin. A jury could find that Mr. Villanueva-Galvez's stance was the "natural result of facing . . . officers with guns drawn and a barking police canine . . . rather than an attempt to flee the scene." *Fink-Carver*, 2024 WL 734496, at *8.

Construing the evidence in the light most favorable to Mr. Villanueva-Galvez, a reasonable jury could conclude that he was not resisting arrest, or that at most, his resistance was entirely passive.

#### c.    Balancing

On balance, viewing the disputed facts in Mr. Villanueva-Galvez's favor, the majority of the *Graham* factors, including the "most important" factor of threat to officer safety, weigh in favor of Mr. Villanueva-Galvez. This case does not present a circumstance in which police officers were forced to make "split-second judgments" in a situation that was "rapidly evolving." *See Chew*, 27 F.3d at 1443 (quoting *Graham*, 490 U.S. at 397). To the contrary, Mr. Villanueva-Galvez was in his apartment for four hours before Officer Anaya deployed Ronin, and officers had the ability to observe his location and movements inside the apartment using a pole camera. *See id.* (reversing district court's grant of summary judgment in favor of defendants where plaintiff

"was trapped in the scrapyard for two uneventful hours before [police dog] bit and mauled him").

On this record, the Court cannot conclude as a matter of law that Officer Anaya's use of force was reasonable.

### 2.    Use of deadly force

Mr. Villanueva-Galvez contends that Officer Anaya unreasonably and unnecessarily used deadly force against him by ordering a police canine to bite him.  Dkt. No. 55 at 4, 7-12, 16.

A police officer may not use deadly force to arrest a suspect "unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Garner*, 471 U.S. at 3.  In *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc), the Ninth Circuit addressed whether and under what circumstances the use of a police canine may be considered a use of deadly force.  In that case, police officers responded to reports of domestic violence by plaintiff Smith.  *Id.* at 693.  When officers arrived at his home, Smith refused to surrender.  *Id.*  The officers sprayed him "in the face with pepper spray," grabbed him from behind, "slammed him against the door," and "threw him down the porch[.]"  *Id.* at 694.  The officers also ordered a police canine to bite him four times, once on his "right shoulder and neck area," once on his "arm," once on his "shoulder blade," and once on his "buttock."  *Id.*  Smith argued that the officers' deployment of the canine constituted deadly force.  *Id.* at 700.  The district court granted summary judgment for defendants.  *Id.* at 695.  On appeal, the Ninth Circuit reversed, holding that whether use of force is "deadly" depends upon "whether the force employed creates a substantial risk of causing death or serious bodily injury."  *Id.* at 706 (citation modified).  The court declined to determine "whether the use of a police dog to subdue a suspect constitutes deadly force" in all circumstances and instead left "to the district court the first opportunity to apply the concept to the facts of th[e] case."  *Id.* at 707.  The court emphasized that even though no prior case had found that the use of a canine constituted deadly force, "we have never stated that the use of such dogs cannot constitute such force."  *Id.*  More recently, the Ninth Circuit has observed that "[b]oth the nature and degree of physical contact and the risk of harm and the actual harm experienced are relevant" in analyzing the use of force, such that deployment of police dog may be considered a severe use of force or an

intermediate use of force, "depending on the suspect's condition when the dog was ordered to attack, how long the attack lasted, and whether the dog was within its handler's control." *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (citation modified and citations omitted).

Defendants do not contend that the use of deadly force against Mr. Villanueva-Galvez would have been reasonable in the circumstances presented. Rather, defendants argue that "the use of the dog did not rise to the level of 'deadly force,' nor did [p]laintiff face life-threatening consequences from the bite." Dkt. No. 51 at 9. In support of this argument, defendants rely principally on the Ninth Circuit's decision in *Miller v. Clark*, 340 F.3d 959 (9th Cir. 2003). *Id.* In *Miller*, the Ninth Circuit concluded that use of a police canine did not rise to the level of deadly force even though the canine bit the plaintiff for a full minute and the bite reached the bone of the plaintiff's arm and "shredded" his muscles. *Miller*, 340 F.3d at 961-63. Defendants argue that Mr. Villanueva-Galvez's injuries are less severe than those suffered by the plaintiff in *Miller* and Ronin's second bite, at least, did not last as long. *See* Dkt. No. 51 at 9, 14.

Mr. Villanueva-Galvez responds that Officer Anaya's use of a police canine here, including his initial deployment of Ronin, his conduct after he lost sight of Ronin, and his failure to call Ronin off once the officers located Mr. Villanueva-Galvez inside the apartment constitutes use of deadly force. *See* Dkt. No. 55 at 8-12, 16-17. Specifically, Mr. Villanueva-Galvez points to the following facts: Officer Anaya knew, based on Officer Fernandez's observations, that Mr. Villanueva-Galvez was lying on his bed inside his bedroom with the bedroom door open approximately 13 minutes before the officers entered the apartment; Officer Anaya deployed Ronin as other officers deployed canisters of a chemical agent into the apartment; Officer Anaya allowed Ronin to move out of view and Ronin failed to return in response to Officer Anaya's recall commands; Officer Anaya continued to wait outside the apartment even after Ronin failed to respond to his commands; and after the officers found Mr. Villanueva-Galvez injured and not resisting inside the apartment, Officer Anaya did not immediately call Ronin off. *See id.* Mr. Villanueva-Galvez also cites use of the canine to bite his face, head, and neck as presenting a substantial risk of death or serious injury. *Id.* at 10-11.

Defendants' arguments are not persuasive. "While the extent of [plaintiff's] injuries is

15

relevant, the essential focus of the inquiry is the *risk* posed by the force used, which requires assessing the facts from the perspective of the police officers at the time of the bite." *Paredes*, 760 F. Supp. 3d at 911 (citations omitted); *see Chew*, 27 F.3d at 1441 (finding police officer "had good reason to expect" severe injuries where dog "was sent to locate a *concealed* suspect, the dog would almost necessarily be out of sight of its handler, and hence beyond the reach of a countermanding order, if and when he came upon [plaintiff]"). Crediting Mr. Villanueva-Galvez's evidence, the Court finds that a reasonable jury could conclude that the use of force against him in this case was severe. *See Paredes*, 760 F. Supp. 3d at 911; *Lowry*, 858 F.3d at 1257 (discussing police dog precedent). Defendants are not entitled to summary judgment solely based on the outcome of the force used or the comparatively shorter duration of Ronin's second bite as compared to the bite in *Miller*.[7]

In addition, defendants' reliance on *Miller* is misplaced because the case was decided before *Smith* and therefore did not apply the deadly force standard the Ninth Circuit set out in *Smith*. *Miller* is also distinguishable because the police canine in that case bit the plaintiff's arm whereas here, it is undisputed that Ronin bit Mr. Villanueva-Galvez multiple times on his face, head, and neck, as well as on his arm. Officer Anaya testified that when a police dog bites a person on his face, head, or neck, it is "on [the officers] to try to remove the dog as soon as practical" because bites to those areas could cause significant or substantial harm. Dkt. No. 55-1 ¶ 3, Ex. 2 (Anaya Dep. at 37:22-38:25). Defendants' expert similarly testified that a dog bite to the neck, head, or groin could cause serious bodily harm or injury because "[t]hose are sensitive areas." Dkt. No. 55-1 ¶ 8, Ex. 7 (Tawney Dep. at 41:25-42:4). Mr. Villanueva-Galvez suffered at least 11 bites in these "sensitive areas." *See* Dkt. No. 55-1 ¶ 2, Ex. 1 at 6-7. Thus, a jury could conclude that use of a police dog here constituted use of deadly force.

Defendants appear to argue that the use of a police dog to bite Mr. Villanueva-Galvez's face, head, and neck in this case was reasonable as a matter of law because "Ronin will only bite a suspect in these areas if there is no other location on the body that he can access, like an arm or

---

[7] As noted above, it is not clear for how long Ronin bit Mr. Villanueva-Galvez on his face, head, and neck.

16

leg, or if the suspect is fighting the dog or otherwise attempting to evade apprehension." Dkt. No. 51 at 5. However, there is a dispute of fact on this point. Mr. Villanueva-Galvez says that he was standing up and had just opened his bedroom door when Ronin jumped on him and started biting his neck. Dkt. No. 55-1 ¶ 9, Ex. 8 (Villanueva-Galvez Dep. at 65:14-66:1). There is thus a material factual dispute about the circumstances of Ronin's bites to Mr. Villanueva-Galvez's face, head, and neck areas. A jury could credit Mr. Villanueva-Galvez's testimony and, given the circumstances as to which there are no disputes, could find that Officer Anaya's use of the police canine was an unreasonable use of deadly force.

If Officer Anaya's actions amounted to use of deadly force, he was entitled to use that force only if it was "necessary to prevent the escape [of Mr. Villanueva-Galvez] and [Officer Anaya] ha[d] probable cause to believe that [Mr. Villanueva-Galvez] pose[d] a significant threat of death or serious physical injury to [Officer Anaya] or others." *Garner*, 471 U.S. at 3. Because there is a genuine dispute of material fact as to whether Officer Anaya's actions rose to the level of deadly force and whether such force was necessary here, defendants are not entitled to summary judgment.

Accordingly, the Court denies Officer Anaya's motion for summary judgment on Mr. Villanueva-Galvez's excessive force claim.

### B.    Qualified Immunity (Officer Anaya)

Although Mr. Villanueva-Galvez has demonstrated that a reasonable jury could find that Officer Anaya violated his Fourth Amendment rights, Officer Anaya can nonetheless prevail on summary judgment if the undisputed facts demonstrate that he is entitled to qualified immunity.

The doctrine of qualified immunity shields a police officer from individual liability for civil damages if the officer's conduct does not violate a clearly established constitutional right. *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016). Where, as here, defendants assert qualified immunity at summary judgment, courts conduct a two-prong inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). Viewing the record in the light most favorable to the non-moving party, the court considers "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v.*

17

*California*, 746 F.3d 1112, 1116 (9th Cir. 2014).  A court may exercise its discretion to address either prong first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Mr. Villanueva-Galvez alleges at least three separate acts of excessive force against Officer Anaya.  First, Mr. Villanueva-Galvez argues that Officer Anaya's initial deployment of the police dog was an excessive use of force.  *See* Dkt. No. 14 ¶ 28; Dkt. No. 55 at 20-21, 23-24.  Second, Mr. Villanueva-Galvez claims that Officer Anaya's failure to intervene after Ronin did not respond to Officer Anaya's recall commands while Ronin was out of sight violated the Fourth Amendment.  *See* Dkt. No. 14 ¶ 28; Dkt. No. 55 at 20-21.  Third, Mr. Villanueva-Galvez argues that it was unreasonable for Officer Anaya to allow Ronin to keep biting Mr. Villanueva-Galvez's left arm for 14 seconds after Officer Anaya "discovered [p]laintiff in his hallway—incapacitated, covered with blood, and unarmed."  Dkt. No. 55 at 21-22.

The Court first addresses the question of qualified immunity with respect to the initial deployment of the police dog before turning to the other aspects of Mr. Villanueva-Galvez's excessive force claim.

### 1.    Deployment of police dog

As discussed above, a reasonable jury could find that Officer Anaya's deployment of Ronin violated Mr. Villanueva-Galvez's Fourth Amendment rights.  Because Mr. Villanueva-Galvez has a viable excessive force claim, the qualified immunity inquiry turns on whether Officer Anaya "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."  *Bates*, 731 F. Supp. 3d at 1136 (quoting *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc)).  "In the Ninth Circuit, we begin [the clearly established] inquiry by looking to binding precedent.  If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end."  *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quotation marks and citation omitted).  "There need not be a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate."  *Simmons v. G. Arnett*, 47 F.4th 927, 934 (9th Cir. 2022) (quotation marks and citation omitted).  "The plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the violation."  *Id.* at 934-35.

United States District Court
Northern District of California

18

United States District Court
Northern District of California

The incident in question occurred on October 2, 2023, so all case law that could "clearly establish" a violation must have been published before that date.

Mr. Villanueva-Galvez relies primarily on *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087 (9th Cir. 1998) to argue that the right allegedly violated by Officer Anaya's use of force was clearly established at the time of the incident. Dkt. No. 55 at 19-21. Specifically, Mr. Villanueva-Galvez contends that *Watkins* gave notice to Officer Anaya that deploying Ronin "into a suspect's small apartment" where the suspect "did not pose any immediate threat" was objectively unreasonable. *Id.* at 20, 23-24. In *Watkins*, a police officer responded to a silent alarm at a commercial warehouse and released a police dog to locate the plaintiff. *Watkins*, 145 F.3d at 1090. The police dog found the plaintiff under a car and bit him. *Id.* Upon arriving on the scene, the officer did not call the dog off and instead ordered the plaintiff to show his hands. *Id.* Recoiling from the dog bite, the plaintiff could not comply with the order and the dog continued biting him for 10 to 30 more seconds. *Id.* The Ninth Circuit affirmed the district court's denial of qualified immunity, holding that the plaintiff had adequately alleged a constitutional violation where the officer "continued to allow [the dog] to bite him even though he was obviously helpless and surrounded by police officers with their guns drawn." *Id.* at 1090, 1094. The Ninth Circuit explained that "it was clearly established that [the] excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation." *Id.* at 1093.

*Watkins* did not clearly establish that Officer Anaya's initial deployment of Ronin to locate Mr. Villanueva-Galvez was unconstitutional. Indeed, in *Watkins*, the Ninth Circuit held that the officer's deployment of a police dog pursuant to Oakland's "bite and hold" policy did not violate clearly established law concerning the use of excessive force. *Watkins*, 145 F.3d at 1092. There, the plaintiff "ma[de] a different claim of excessive force . . . that the *duration and extent of force* applied in effecting arrest *after the officers caught up with* [the police dog] amounted to an unconstitutional application of force." *Id.* at 1093 (emphasis added).

Mr. Villanueva-Galvez argues that "[s]ince every reasonable officer knows that excessive bite duration can constitute excessive force, (*Watkins*), it follows that releasing a K9 to bite and

hold a concealed suspect" is unconstitutional.  Dkt. No. 55 at 20-21.  The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question of whether the official acted reasonably in the particular circumstances that he or she faced.'"  *Rosenbaum v. City of San Jose*, No. 20-cv-04777-LHK, 2021 WL 6092205, at *6 (N.D. Cal. Dec. 23, 2021) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63-64 (2018)).  To the extent that Mr. Villanueva-Galvez contends that *Watkins* stands for the proposition that the initial deployment of a canine to locate and apprehend a suspect is unconstitutional, he is mistaken.

As of October 2023, the Ninth Circuit had indicated that use of a canine might be considered deadly force, but had not (and, to the Court's knowledge, still has not) defined precisely when or if such use constitutes deadly force.  *See Smith*, 394 F.3d at 707.  However, as of October 2023, the Ninth Circuit *had* defined with some particularity the circumstances in which use of a police dog constituted non-deadly, excessive force.  In *Smith*, the Ninth Circuit held that a jury could find that use of a police dog on the plaintiff, while officers pepper-sprayed and "pinned down" the plaintiff, could constitute excessive force because the plaintiff did not pose an immediate threat to anyone, the nature of the crime was not so severe to warrant such force, and the plaintiff did not attempt to run from the officers.  *Smith*, 394 F.3d at 701-04.  In addition, the Ninth Circuit has held that "[a] police officer violates the Fourth Amendment when he or she allows a police dog to continue biting a suspect who has fully surrendered and is under officer control."  *See Rosenbaum*, 107 F.4th at 924 (holding plaintiff had adequately alleged a constitutional violation that was clearly established where officer allowed police dog to continue biting plaintiff for more than twenty seconds after he had fully surrendered and was under officer control); *see also Watkins*, 145 F.3d at 1090, 1094 (holding that officer violated clearly established law where officer "continued to allow [the dog] to bite him even though he was obviously helpless and surrounded by police officers with their guns drawn"); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control.").

Given the genuine disputes of material fact described above, the Court cannot determine on this record that Officer Anaya's initial deployment of a police dog in these circumstances violated no clearly established right. Whether Officer Anaya is entitled to qualified immunity with respect to this aspect of Mr. Villanueva-Galvez's excessive force claim depends on the resolution of these disputed facts. *See, e.g.*, *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532, 538 (9th Cir. 2010) (affirming denial of summary judgment on qualified immunity grounds because there were genuine issues of fact regarding whether the officers violated plaintiff's Fourth Amendment rights, which were "material to a proper determination of the reasonableness of the officers' belief in the legality of their actions").

### 2.    Failure to act and duration of dog bite

Mr. Villanueva-Galvez also alleges that Officer Anaya violated his Fourth Amendment rights by failing to act when Ronin did not respond to his recall commands and by allowing Ronin to keep biting Mr. Villanueva-Galvez's left arm for 14 seconds before calling the dog off. Dkt. No. 14 ¶ 28; Dkt. No. 55 at 20-22.

As discussed above, there is a genuine dispute of material fact as to whether Officer Anaya used objectively reasonable force, and in turn, whether his use of force violated Mr. Villanueva-Galvez's Fourth Amendment rights as a matter of law with respect to the duration of the bite. The Court concludes there is also a genuine dispute of material fact regarding whether Officer Anaya acted unreasonably in permitting Ronin to go out of his sight and by not taking some more immediate action when Ronin failed to respond to his repeated commands to return. Specifically, the parties dispute whether it was reasonable for Officer Anaya to wait outside the apartment even after Ronin failed to respond to recall commands; whether Officer Anaya knew that Ronin was biting Mr. Villanueva-Galvez while Ronin was out of sight; whether Officer Anaya heard Mr. Villanueva-Galvez scream or groan; whether Mr. Villanueva-Galvez posed an immediate threat to the officers; and whether Mr. Villanueva-Galvez resisted arrest when the officers found him in the hallway. Given these disputes, the Court cannot determine on this record that Officer Anaya's conduct violated no clearly established right. *See, e.g.*, *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (denying officers' qualified immunity argument on summary judgment

21

"[b]ecause of the factual disputes that [plaintiff] has identified"); *Bates*, 731 F. Supp. 3d at 1136 (holding that granting qualified immunity on summary judgment "is inappropriate where the determination ultimately depends on disputed factual issues" (quotations and citations omitted)).

Accordingly, the Court denies Officer Anaya's motion for summary judgment based on qualified immunity.

### C.     State Law Claims (All Defendants)

Finally, defendants move for summary judgment on Mr. Villanueva-Galvez's state law claims—i.e., Mr. Villanueva-Galvez's claim under the Bane Act and his claims for battery and negligence.

#### 1.     Claim 3: Bane Act claim

The Bane Act authorizes civil actions for damages and injunctive relief by individuals whose federal or state rights have been interfered with by threats, intimidation, or coercion. *See* Cal. Civ. Code § 52.1 (proscribing interference "by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state"); *see also Jones v. Kmart Corp.*, 17 Cal. 4th 329, 338 (Cal. 1998) (interpreting Bane Act's use of "interferes" to mean "violates"). "[T]he Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 800 (Cal. Ct. App. 2017), *as modified* (Nov. 17, 2017)). Instead, the Bane Act requires a showing that a defendant had a specific intent to violate the plaintiff's protected rights. This specific intent inquiry centers on two questions: "First, 'is the right at issue clearly delineated and plainly applicable under the circumstances of the case,' and second, 'did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right?'" *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (quoting *Cornell*, 17 Cal. App. 5th at 803) (citation modified). Specific intent does not require a showing that a defendant knew he was acting unlawfully; "[r]eckless disregard of the

United States District Court
Northern District of California

'right at issue' is all that [is] necessary." *Cornell*, 17 Cal. App. 5th at 804.

The Court has already concluded that a reasonable jury could find that Officer Anaya used excessive force in violation of the Fourth Amendment. For all the reasons discussed above, the Court finds that, when viewed in the light most favorable to Mr. Villanueva-Galvez, a reasonable jury could likewise find that this same conduct constitutes reckless disregard of his rights under the Fourth Amendment.

Accordingly, the Court denies defendants' motion for summary judgment on this claim.

### 2. Claims 4 and 5: battery and negligence claims

Mr. Villanueva-Galvez alleges that defendants are liable to him for battery and negligence based on Officer Anaya's use of force against him. Dkt. No. 14 ¶¶ 46-57. Because Mr. Villanueva-Galvez brings this claim against a police officer, he must prove that Officer Anaya used unreasonable force in addition to the other elements of battery. *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (Cal. Ct. App. 1998) ("Plaintiff must prove unreasonable force as an element of the tort."). Likewise, to prevail on a negligence claim against a police officer, the plaintiff must allege that the police officer "acted unreasonably and that the unreasonable behavior harmed" plaintiff. *Ortega v. City of Oakland*, No. 07-cv-02659-JCS, 2008 WL 4532550, at *14 (N.D. Cal. Oct. 8, 2008).

Because there is an issue of triable fact regarding whether Officer Anaya's use of force was unreasonable, the Court denies defendants' motion for summary judgment on these claims.

## IV. CONCLUSION

For the reasons explained above, defendants' motion for summary judgment is granted with respect to Mr. Villanueva-Galvez's *Monell* claim (claim 2), and is otherwise denied. The Court also denies defendants' motion for summary judgment that Officer Anaya is entitled to qualified immunity.

**IT IS SO ORDERED.**

Dated: June 2, 2026

Virginia K. DeMarchi
United States Magistrate Judge

23